**UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

AMERICAN CIVIL LIBERTIES UNION OF SOUTH
CAROLINA FOUNDATION,

*Plaintiff,*

v.

ALAN WILSON, in his official capacity as South
Carolina Attorney General; BRYAN STIRLING,
in his official capacity as Director of the South
Carolina Department of Corrections,

*Defendants.*

Case No. 3:25-537-JFA

**Complaint for Declaratory and
Injunctive Relief**

1.      The death penalty has long been a grave political issue subject to intense public scrutiny. Its proponents and opponents alike have examined and criticized states' execution policies and procedures. In the lethal injection era, much of that public oversight has focused on how the drugs are made, tested, procured, stored, and administered.

2.      More recently, South Carolina found this public scrutiny inconvenient because that made it more difficult to purchase lethal injection drugs at a price the state was willing to pay.

3.      But rather than entering the marketplace of ideas and persuading the public (or the drug suppliers) that the state's views were correct, the state opted to shut down the marketplace by enacting a sweeping Secrecy Statute to silence political speech it disfavors

4.      The vast Secrecy Statute criminalizes the disclosure of any information even tangentially related to individuals or entities involved in executions—such as entities who manufacture, compound, distribute, supply, test, or administer lethal injection drugs, S.C. Code Ann. § 24-3-580—including the amount the state paid for the drugs or other equipment.

5.      This ban not only departs from the state's history of making execution-related information publicly available but criminalizes the disclosure of this information by anyone for any reason. It thus silences the scientists, doctors, journalists, former correctional officials, lawyers, and citizens who seek to scrutinize the safety, efficacy, morality, and legality of South Carolina's use of lethal injection.

6.      That approach is repugnant to the First Amendment. The Secrecy Statute serves an impermissible goal— silencing disfavored speech—by facially discriminating against speech based on its viewpoint and content and restricting the public's right of access to information. The First Amendment permits none of that.

## PARTIES

7.      Plaintiff **American Civil Liberties Union of South Carolina Foundation ("ACLU-SC")** is a nonprofit organization incorporated in South Carolina. The mission of ACLU-SC is to protect and advance civil rights and civil liberties in South Carolina through advocacy, education, and litigation. As a component of its work, ACLU-SC investigates, solicits, disseminates, and otherwise relies on information about the death penalty and how it is administered to advocate for the humane and legal treatment of prisoners.

8.      Defendant **Alan Wilson** is Attorney General of South Carolina and is the chief prosecutor responsible for enforcing the state's criminal law, including criminally enforcing the Secrecy Statute's Universal Disclosure Ban, S.C. Code Ann. § 24-3-580(C). Attorney General Wilson is sued in his official capacity.

9.      Defendant **Bryan Stirling** is Director of the South Carolina Department of Corrections (SCDC). Director Stirling is the final policymaker at SCDC and is responsible for enforcing the Secrecy Statute's State Disclosure Ban, S.C. Code Ann. § 24-3-580(G). *See* S.C. Code Ann. §§ 24-1-40, 90, 130. Director Stirling is sued in his official capacity.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because ACLU-

SC's causes of action arise under the United States Constitution and 42 U.S.C. § 1983.

11.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims brought by ACLU-SC occurred in the District of South Carolina and because both Plaintiff and Defendants are located in this District.

12.     Venue is proper in the Columbia division under Local Civil Rule 3.01 because that is where Plaintiff and Defendants reside and where a substantial portion of the events or omissions giving rise to the claims occurred.

## FACTS

**Capital Punishment in South Carolina**

13.     The death penalty has existed in South Carolina since its founding. *See generally Owens v. Stirling*, 904 S.E.2d 580, 585 (S.C. 2024) (discussing the history of capital punishment in South Carolina).

14.     During the 18th and 19th centuries, executions were carried out by hanging. *Id.* But in the early 20th century, scientific understanding and the public's moral evaluation of the death penalty shifted: hanging was increasingly considered an inhumane and thus disfavored method of execution. Responding to this evolution in public opinion, South Carolina joined many other states in adopting electrocution as its primary method of execution. *Id.*

15.     Toward the end of the 20th century, changes in scientific understanding, public morals, and legal doctrine once again led to changes—this time away from electrocution. Following this national trend, in 1995, South Carolina made lethal injection the primary method of execution. *Id.*

16.     Since 1995, South Carolina has conducted the vast majority of executions by lethal injection.

17.     Today, South Carolina law provides for three methods of execution: lethal injection, firing squad, and electrocution. S.C. Code Ann. § 24-3-530. Condemned individuals

may choose their method of execution. *Id.* The South Carolina Supreme Court recently upheld all three methods as constitutional. *Owens v. Stirling*, 904 S.E.2d 580 (S.C. 2024).

18.     The South Carolina Department of Corrections (SCDC) is the agency responsible for executions. *See generally* S.C. Code Ann. § 24-1-30.

19.     SCDC is governed by a Director appointed by the governor, subject to the advice and consent of the Senate. *Id.* § 24-1-40. The Director is vested with "exclusive management and control of the prison system." *Id.* § 24-1-130. Defendant Stirling has served as SCDC's Director since his confirmation in 2014.

20.     Under South Carolina law, a condemned person has the right to choose between lethal injection, firing squad, and electrocution. If the person does not elect a method, electrocution is the default method. *Id.* § 24-3-530. Likewise, if lethal injection is unavailable, then electrocution must be used unless the condemned person elects execution by firing squad. *Id.*

21.     SCDC is responsible for establishing protocols and procedures for carrying out executions. *Id.* It is also charged with implementing these protocols and procedures, including by acquiring and administering lethal injection drugs. *Id.* § 24-3-540.

22.     The state judiciary plays a key role in the administration of a death sentence. When an individual sentenced to death has exhausted or abandoned all appeals, the South Carolina Supreme Court sends a notice of execution for that individual to the Director of SCDC. S.C. Code Ann. § 17-25-370.

23.     Once SCDC receives the notice of execution, the Director "shall determine and certify by affidavit under penalty of perjury to the Supreme Court whether the methods [of lethal injection, firing squad, or electric chair] are available." S.C. Code Ann. § 24-3-530(B). The Supreme Court, "when it receives the certification, has the authority . . . to ask follow-up

questions or to vacate the notice of the execution if it's unsatisfied with the Director's submission."[1]

24.     After the execution is carried out, "[t]he executioner and the attending physician shall certify the fact of such execution to the clerk of the court of general sessions in which the sentence was pronounced," which "shall be filed . . . with the papers in the case." S.C. Code Ann. § 24-3-560.

**Historical Transparency**

25.     Executions have long been the subject of intense public scrutiny and criticism.

26.     To allow public insight into the death penalty, to establish the death penalty's legitimacy, and to comply with constitutional protections, South Carolina (like many states) has traditionally made a wide array of information regarding executions publicly available.

27.     Historically, executions were open to the public. Indeed, executions were "a fixture of American society," taking place in the middle of the day in "the public square."[2]

28.     Even when executions were moved from the public square into prisons, states, including South Carolina, implemented procedures to ensure executions would remain open to public scrutiny, including accommodating witnesses to every execution.[3] *See* S.C. Code Ann. § 24-3-550.

29.     South Carolina (and other states) have traditionally made a host of additional information, including the methods of execution and the qualifications of the executioners, open to the public. Some states supplied information about both the types of ropes used in hangings and the manufacturers who provided them.[4] Likewise, states have disclosed information

---

[1] Oral argument at 36:10, *Owens v. Stirling*, No. 2022-1280 (S.C. Sup. Ct. Jan. 5, 2023), https://media.sccourts.org/videos/2022-001280.mp4.

[2] John D. Bessler, *Death in the Dark: Midnight Executions in America* 23 (1997).

[3] *See, e.g.*, John H. Blume, *Ghosts of Executions Past: A Case Study of Executions in South Carolina in the Pre-Furman Era*, 107 CORNELL L. REV. 1799, 1819, 1824–26 (2022).

[4] *See, e.g.*, Chris Woodyard, *Enough Rope: The Hangman's Rope in the Press*, Haunted Ohio (Jan. 19, 2013), http://hauntedohiobooks.com/news/enough-rope-the-hangmans-rope-in-

concerning the identities and qualifications of the companies and individuals who created and operated states' gas chambers and electric chairs.[5]

30.    Historically in South Carolina, the public had access to executions. Tickets of admission—sometimes even thousands—were issued to witnesses for executions that occurred behind bars in the late 1800s and early 1900s. At that time, in part because the materials used in executions were visually ascertainable, the public had access to information about the specifics of certain execution methods and materials.

31.    During that time, information was widely available regarding the specific construction of hanging gallows, down to their locations, dimensions, and the weight, material, and origin of specific components. Also publicly available was information about how exactly the gallows was intended to—and ultimately did—cause the death of the condemned.[6]

32.    When South Carolina substituted the electric chair as its primary means of execution, similar information was available. For example, information was available regarding the procurement process; construction of the execution chamber housing the electric chair, including specific materials, dimensions, and the name of individuals involved; the name and location of the company that ultimately supplied the electric chair; the name of that company's

---

the-press/ (summarizing news reports describing the types of ropes used in executions and the suppliers who produced them); *John Brown Hanged with Kentucky Rope*, University of Kentucky Libraries, https://nkaa.uky.edu/nkaa/items/show/1625 (last visited Jan. 21, 2025) (explaining that different ropes were submitted for use in the hanging of abolitionist John Brown, were displayed to the public before the execution, and the strongest and most durable was selected).

    [5] *See, e.g.*, Op. Br. of Pl.-Appellant at 27 & n.12, *Wood v. Ryan*, No. 14-16310, ECF No. 10-1 (9th Cir. July 14, 2014), https://cdn.ca9.uscourts.gov/datastore/general/2014/07/14/ApltOpeningBr.pdf (citing a January 2, 1955, article in the Sarasota Herald Tribune entitled "Eight States Now Are Using Gas Chambers for Executions"); Stuart Banner, *The Death Penalty: An American History* 178–85 (2003); Ken Driggs, *A Current of Electricity Sufficient in Intensity to Cause Immediate Death: A Pre-Furman History of Florida's Electric Chair*, 22 STETSON L. REV. 1169, 1179–84 & n.52 (1993).

    [6] Because the Secrecy Statute forbids disclosure of a broad swath of execution-related information, current and former, *see infra*, ACLU-SC cannot include more specifics here for fear of prosecution or other sanction.

contact with SCDC; how much the chair cost; the materials used to construct the electric chair; the source of electricity to the chair; the exact voltage it would receive; and the qualifications of the chair operator.

33.     In fact, in 1912, the *Charleston News & Courier* reported that "[s]ince the recent completion of the death house there have been scores of visitors to the Penitentiary. Most of them desirous of seeing the place where South Carolina will in the future punish with death persons found guilty of capital offenses, and the guards at the prison are kept busy explaining the particulars of the death chair and its accomplishments."

34.     That transparency continued in the coming decades. In 1961, photographers from *The State* newspaper were permitted to photograph and identify by name the "new switchman for the electric chair at the State Penitentiary." In 1979, *The State* newspaper published a story on renovations to the "death house" by inmate workers that included photographs of the "executioner's stall" and the control panel for the electric chair. In 1988, members of the press were permitted to document and photograph the relocation of the electric chair to Broad River Correctional Institution. Throughout the 1900s, press witnesses to several electric chair executions described the executions, including the layout, construction, and materials of the execution chamber and the adjacent witness area.

35.     When South Carolina again changed its primary execution method, this time to lethal injection, similar information remained available. In 1995, before the first lethal injection execution in South Carolina, SCDC disclosed the drugs that would be used and certain qualifications of the executioners and supervisors, including information about licenses, certification, and education.

36.     In 2020, SCDC released a public record containing a detailed description of the execution chamber, including dimensions of the room, the electric chair itself, different components of the chair, and the chair's platform; the materials that comprise the chair and its components; the witness area and the "executioner's room"; the timing, voltage, and amperes of each electrical current administered to the condemned; and the sources of the electrical power.

37.    On March 18, 2022, SCDC publicly announced that it had renovated its execution chamber and developed a protocol to carry out executions by firing squad. The announcement described the firing squad protocol and the cost of supplies and materials.

38.    In 2022, SCDC released photographs of the execution chamber, including photographs of the electric chair, firing squad chair, gurney, and witness room; redacted invoices showing the prices of firing squad-related material, including a ballistic blanket, ballistic armor partition, ballistic glass, sand bags, straps, locking swivel casters, gloves, bullets, silencers, and rifles; and documents showing the dates of construction repairs at the execution chamber.

39.    In addition to firing squad-related disclosures, SCDC also released images of the control panel and external generator connected to the electric chair in 2022.

40.    As late as 2023, SCDC continued to provide information related to executions.

41.    Prior to the Secrecy Statute's passage in 2023, SCDC disclosed redacted invoices for certain execution equipment, letters it had circulated requesting pentobarbital, an unredacted "Request for Information for Execution Drugs" soliciting pentobarbital, and unredacted correspondence from specific companies objecting to any use of their products in executions.

**The Problem: Public Criticism**

42.    In the lethal injection era, advocacy organizations, journalists, scientists, attorneys, activists, and other citizens have relied on this information to scrutinize the safety, quality, efficacy, legality, and morality of lethal injection drugs and protocols.

43.    For example, three years ago, *The State* published a piece based on its conversations with ten South Carolina government employees previously involved in executions. These individuals' experiences converted many of them into opponents of the death penalty, and some believe that their involvement in executions is a sin that condemned them to hell. Others had contemplated suicide. They spoke openly about their experiences carrying out executions.

44.    Since states began adopting lethal injection, critics—of particular lethal injection drugs; specific drug-makers; certain execution protocols; and of the death penalty more

broadly—mounted public campaigns aimed at persuading fellow citizens, and the private companies they ran, not to sell drugs to states for use in lethal injection.

45.    These public campaigns helped convince many pharmaceutical manufacturers not to sell their drugs for use in lethal injections. Citing both business and moral reasons, over fifty pharmaceutical firms have voiced their opposition to states' attempts to use their drugs for lethal injection. For instance, Abbott said that it communicated with "departments of corrections in the United States to request" that its drugs "not be used in capital punishment procedures." Pfizer released a statement saying that it "makes its products to enhance and save the lives of the patients we serve," and "strongly objects to the use of its products as lethal injections for capital punishment."

46.    Pharmaceutical manufacturers imposed sweeping controls on the distribution of their products to ensure that their drugs were not used in lethal injections. Those efforts included lawsuits, new contractual provisions, and public campaigns.

47.    Many of those manufacturers oppose secrecy statutes because they make it difficult for the manufacturers to ensure their drugs are not being used in executions.

48.    Unable to obtain drugs from reputable pharmaceutical companies, South Carolina tried to buy drugs from an unregulated overseas pharmacy that was operating out of a non-medical facility in England, in violation of federal regulations.

49.    Once again, advocacy organizations, journalists, scientists, attorneys, activists, and other concerned citizens scrutinized and criticized these practices and sought to persuade foreign companies against supplying them. As a result of that public scrutiny—and a crackdown by federal regulators—South Carolina was no longer able to obtain drugs from foreign companies.

50.    South Carolina thus began experimenting with domestic compounding pharmacies. Unlike pharmaceutical manufacturers who are overseen by the FDA and subject to stringent development, testing, and quality controls regulations, compounding pharmacies

operate underground. They do not have their drugs tested for safety or efficacy by the FDA, and investigations have revealed that many have long track records of safety and cleanliness issues.

51.    That is particularly problematic given the short shelf-life, higher failure rate, and general lack of oversight of compounded drugs. Compounders' slipshod practices have led to tainted drugs and deadly outbreaks. One investigation revealed that 1 in 5 compounded drugs surveyed failed to meet state standards.[7]

52.    The problems inherent in using drugs from unregulated compounding pharmacies are magnified by corrections departments' failures. Documented correctional failures include using expired drugs, administering the wrong dosage of drugs, and hiring physician-executioners who have been sued more than a dozen times for malpractice and been barred from practicing at multiple hospitals. These issues have combined to cause some executions to be called off and others to be botched, where prisoners remained conscious, moved around, and gasped for breath—sometimes for multiple hours.

53.    This track record has generated significant public outcry and criticism of compounders' practices and states' decisions to perform executions with these unreliable drugs.

54.    According to Director Stirling, this scrutiny made compounders less willing to sell lethal injection drugs to SCDC. In short, compounders decided that the costs of that public scrutiny outweighed the profits they were able to obtain from selling SCDC the drugs.

55.    Thus, when South Carolina's supply of lethal injection drugs expired in 2013, the state had difficulty finding a supplier of drugs at the price it was willing to pay.

---

[7] Chris McDaniel, *Missouri Fought for Years to Hide Where It Got Its Execution Drugs. Now We Know What They Were Hiding*, BUZZFEED NEWS (Feb. 20, 2018), https://www.buzzfeednews.com/article/chrismcdaniel/missouri-executed-17-men-with-drugs-from-a-high-risk (citing annual reports published by the Missouri Division of Professional Registration's Board of Pharmacy); *cf.* Jennifer Gudeman et al., *Potential Risks of Pharmacy Compounding*, 13 DRUGS IN R&D 1, https://tinyurl.com/59v2exxj.

**South Carolina's Solution: Silence Disfavored Speech**

56.     To overcome these challenges, SCDC could have competed in the marketplace of ideas and persuaded its critics (or at least drugmakers).

57.     Alternatively, the state could have paid compounders more or developed the drugs in-house.

58.     Instead of taking these approaches, Director Stirling began advocating for the suppression of the inconvenient speech.

59.     Director Stirling first attempted to silence public scrutiny and criticism by asking South Carolina Attorney General, Defendant Wilson, to render an opinion interpreting a limited preexisting statute to bar disclosing information related to compounders and other entities involved in lethal injection.

60.     That preexisting statute, which had been enacted in 2010, protected the identities of the individual executioners by "prohibit[ing] the disclosure under certain circumstances of the identity of members of an execution team and to allow for civil penalties for a violation of the section." 2010 S.C. Act No. 203.[8] It did not define "execution team" to include entities involved in the supplying of lethal injection drugs; prohibit disclosing the qualifications of these companies or the executioners themselves; or provide for criminal sanctions. *Id.*

61.     Defendant Wilson's office acquiesced with an opinion concluding that the statute covered "an individual or company providing or participating in the preparation of chemical

---

[8] The relevant part of that statute provided: "A person may not knowingly disclose the identity of a current or former member of an execution team or disclose a record that would identify a person as being a current or former member of an execution team. However, this information may be disclosed only upon a court order under seal for the proper adjudication of pending litigation. Any person whose identity is disclosed in violation of this section shall have a civil cause of action against the person who is in violation of this section and may recover actual damages and, upon a showing of a wil[l]ful violation of this section, punitive damages." S.C. Code Ann. § 24-3-580 (2010).

compounds intended for use by the Department of Corrections for 'carrying out an order of execution by lethal injection.'"[9]

62.     Even with this interpretation in hand, SCDC was unable to obtain lethal injection drugs at the price it was willing to pay. As Defendant Stirling explained: "I asked the Attorney General's office for an opinion on the shield law and if our law that we had on the books now was strong enough, we took that to manufacturers and compounding pharmacies and they still, without an actual law on the books, a stronger law on the books . . . they would not sell us the drugs."[10]

63.     Defendant Stirling, joined by Governor McMaster, lobbied the General Assembly to enact that "stronger" Secrecy Statute that would expand the original shield law to expressly cover all companies involved in creating and supplying the drugs and contain stronger enforcement mechanisms.

64.     Governor McMaster and Defendant Stirling have openly explained that the purpose of statute is to silence speech about who makes lethal injection drugs because that speech made it difficult for SCDC to acquire drugs (at a price it was willing to pay).

65.     As early as 2016, Defendant Stirling acknowledged that opponents of the death penalty had been "very successful" at obtaining information about the creators and suppliers of lethal injection drugs and then convincing those companies not to sell them to SCDC. According to Defendant Stirling, the proposed Secrecy Statute would ensure that such critics could not "target" their speech toward these companies.[11]

66.     The statute's early legislative sponsors shared this rationale. For instance, Senator Paul Campbell, chairman of the subcommittee that considered the Secrecy Statute in 2015,

---

[9] *Regarding the Interpretation of Section 24-580 of the South Carolina Code*, Op. Att'y Gen. S.C., 2015 WL 4699337, at *4 (S.C.A.G. July 27, 2015).
[10] *This Week in South Carolina, Director Bryan Stirling and Author Lydia Mattice Brandt*, at 01:48 (June 25, 2021), https://video.scetv.org/video/director-bryan-stirling-and-author-lydia-mattice-brandt-urkxdx/.
[11] Sarrita Chourey, *SC Looks to Keep Injection Drug Suppliers Secret*, AUGUSTA CHRON., 2016 WLNR 6813039 (Feb. 19, 2016).

explained that the statute was intended to protect the drugmakers and suppliers from criticism and protests.

67.     In a 2017 joint press conference,[12] Defendant Stirling and Governor McMaster called on the General Assembly to pass the Secrecy Statute. Governor McMaster explained that "despite intense efforts" the state had been unable to acquire the drugs because the compounders and distributors feared that "the inquiring press and inquiring people" would discover their identities and launch a lobbying campaign. Similarly, Defendant Stirling claimed that the "reason" people want to know who produces lethal injection drugs is so they will "be able to go to the companies" and convince them not to "sell the drugs."

68.     In his 2023 state of the state address, Governor McMaster again emphasized that the Secrecy Statute was needed to shield drugmakers identities "from anti-death penalty activists."

69.     Pharmaceutical manufacturers vigorously opposed the Secrecy Statute because it undermines the system of accountability that ensures the safety and efficacy of drugs, which creates adverse public health consequences. Several of these companies have filed amicus briefs explaining the dangers of the Secrecy Statute.

70.     Nevertheless, South Carolina's General Assembly took up the statute once more in early 2023. As before, the Secrecy Statute's legislative sponsors explained that the statute was designed to suppress unwanted public scrutiny. The primary sponsor of the Secrecy Statute that ultimately passed, Senator Greg Hembree, noted that legislators "worked closely" with Director Stirling to "try [and] get a bill that would allow him to pursue this policy[.]"[13] Another key sponsor, Representative Jay Jordan emphasized that a "strong" law was necessary and introduced the criminal prohibition to deter whistleblowers.

71.     On May 12, 2023, Defendant McMaster signed the Secrecy Statute into law.

---

[12] Henry McMaster, *Governor McMaster and SCDOC Director Stirling Discuss Lethal Injection Drug Shield Law*, YOUTUBE, at 1:55 (Nov. 20, 2017), https://perma.cc/D9RT-Y9L4.
[13] John Monk, *Executions in SC Could Restart After McMaster Signs 'Shield' Law to Remove Major Hurdle*, THE STATE, 2023 WLNR 16999171 (May 15, 2023).

**The Secrecy Statute**

72.     The Secrecy Statute bars disclosure of any "[i]dentifying information" of a member of the "[e]xecution team." S.C. Code Ann. § 24-3-580. Both terms are defined broadly.

73.     Under the Secrecy Statute, the term "'[e]xecution team' shall be construed broadly to include any person or entity that participates in the planning or administration of the execution of a death sentence, including any person or entity that prescribes, compounds, tests, uses, manufactures, imports, transports, distributes, supplies, prepares, or administers the drugs, medical supplies, or medical equipment utilized in the execution of a death sentence." S.C. Code Ann. § 24-3-580(A)(1).

74.     Likewise, the term "'[i]dentifying information' shall be construed broadly to include any record or information that reveals a name, date of birth, social security number, personal identifying information, personal or business contact information, or professional qualifications. The term "identifying information" also includes any residential or business address; any residential, personal, or business telephone number; any residential, personal, or business facsimile number; any residential, personal, or business email address; and any residential, personal, or business social media account or username." S.C. Code Ann. § 24-3-580(A)(2).

75.     The state interprets 'identifying information' to include "whether the drugs are manufactured or compounded" and the "dates when drugs were manufactured, or compounded, or expire."[14]

76.     Additionally, the state has interpreted the Secrecy Statute to bar access, including to ACLU-SC, to a vast swath of information related to execution-related drugs and equipment, including procurement; repairs and maintenance done *after* acquiring the drugs or equipment; protocols; risk mitigation measures; compliance with state and federal regulations; and cost.

---

[14] Reply Br. Defs. Bryan Stirling, SCDC, and Henry McMaster, No. 2022-1280 (S.C. Sup. Ct. Jan. 8, 2024).

77.     The Secrecy Statute applies to all "death sentence[s]" whether they are conducted by lethal injection, electrocution, or firing squad. S.C. Code Ann. § 24-3-580(A)(1).

78.     No state agency or official may "disclose the identifying information of any member of an execution team or any details regarding the procurement and administrative processes[.]" S.C. Code Ann. § 24-3-580(G) ("State Disclosure Ban").

79.     Nor may any "person . . . knowingly disclose the identifying information of a current or former member of an execution team or disclose a record that would identify a person as being a current or former member of an execution team." S.C. Code Ann. § 24-3-580(C) ("Universal Disclosure Ban").

80.     Anyone who discloses such information may be subject to "a civil cause of action" by the member of the execution team or his immediate family. S.C. Code Ann. § 24-3-580(C).

81.     Additionally, the disclosure of such information is a criminal offense punishable by imprisonment up to "three years." *Id.*

82.     As enacted, the Secrecy Statute imposes a sweeping ban on a wide swath of speech about past and future executions because that speech made it more challenging for South Carolina to obtain lethal injection drugs.

83.     In justifying the Secrecy Statute's scope, the state has consistently articulated the statute's purpose: "[T]he minute you begin to disclose anything about the drug, you begin to give *the other side* puzzle pieces as to where the drug came from. So whether it's manufactured or compounded, what's the lot number of the drug or of the bulk materials, you begin to piece together who manufactured it, where could it have been compounded, who could have sold them the bulk material. And the minute you start releasing that, you make it harder for SCDC to get the drugs in the future."[15]

---

[15] Oral argument at 35:45, *Owens v. Stirling*, No. 2022-1280 (S.C. Sup. Ct. Feb. 6, 2024) (emphasis added), https://media.sccourts.org/videos/2022-001280-2.mp4.

**The Result: Chilled Political Speech**

84.     The Secrecy Statute has worked as intended. Shortly after its passage, SCDC was able to obtain pentobarbital to use in executions.

85.     But given the Secrecy Statute, would-be whistleblowers and conscientious objectors have been scared silent. Similarly, advocacy organizations, including ACLU-SC, have not been able to disseminate information they possess.

86.     ACLU-SC possesses "identifying information" as defined by the Secrecy Statute and would disclose and disseminate this information but for the Secrecy Statute's Universal Disclosure Ban.

87.     ACLU-SC and its employees have an objectively well-founded fear that if it disclosed this information, it would be criminally prosecuted for violating the Secrecy Statute.

88.     The Secrecy Statute's suppression of this speech has undermined ACLU-SC's advocacy and education work on the death penalty and burdened its speech.

89.     There is a long track record of reporters, whistleblowers, and conscientious objectors—including employees of the drugmakers and state correctional officials—disclosing information about the creation and procurement of lethal injection drugs and the qualifications of the persons and entities involved.[16]

90.     Yet, since the Secrecy Statute was enacted would-be whistleblowers, investigative reporters, and conscientious objectors have stayed silent rather than face criminal prosecution.

91.     Indeed, the Secrecy Statute now bans disclosure of information used by its backers to lobby for its enactment. Specifically, supporters of the statute relied on records and

---

[16] In Missouri, officials disclosed information to BuzzFeed about the identity of the compounding pharmacy that supplied the state with its lethal injection drugs, which led to a lengthy article detailing the compounding pharmacy and its unsafe practices. That pharmacy no longer sells drugs for lethal injections. Similarly, in Texas, a pharmacist at a compounder spoke with NPR and revealed the name and location of the pharmacy where he worked; detailed the process by which he created the lethal injection drugs; explained how Texas procured it; revealed how much Texas paid for the drugs; and commented on the sanitary conditions at the compounder.

representations from SCDC regarding (failed) attempts to procure lethal injection drugs. Those records and representations were central to efforts to pass the Secrecy Law itself—demonstrating their role in informing public debate and statewide policy. Now, having secured their desired policy outcome, Defendants forcibly deny access to the very same information.

92.    That is textbook viewpoint discrimination: allowing the exchange of information when it fits the state's design, then criminalizing it when public discourse might turn against a preferred outcome.

93.    ACLU-SC requested information about South Carolina's administration of the death penalty from SCDC on October 8, 2024, including information about SCDC's procurement process for execution-related drugs and equipment, maintenance and quality control of drugs and equipment after receiving them, expenses related to drugs and equipment, and compliance with federal regulations. Citing the Secrecy Statute, SCDC refused to provide the requested information.

## PLAINTIFF'S CLAIMS

### *First Cause of Action*
### 42 U.S.C. § 1983
**Section 24-3-580's Universal Disclosure Ban facially violates the First Amendment as an impermissible viewpoint-based restriction on speech.**

94.    The allegations in all previous paragraphs incorporated here.

95.    South Carolina adopted the Secrecy Statute for the express purpose of suppressing particular views: specifically, those critical of lethal injection. The Secrecy Statute bans particular speech to further that purpose of suppressing disfavored views. Thus, the Secrecy Statute constitutes viewpoint discrimination.

96.    Viewpoint discrimination is per se unconstitutional. *Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984).

97.    Likewise, because suppressing particular viewpoints is never a "valid, let alone [a] substantial" (much less compelling) interest, it cannot survive strict scrutiny. *Moody v.*

*NetChoice, LLC*, 603 U.S. 707, 740 (2024); *accord Fusaro v. Cogan*, 930 F.3d 241, 255 (4th Cir. 2019) (observing that the Supreme Court has concluded that "viewpoint discrimination . . . contravenes the First Amendment" in every context "thus far addressed").

98.     The Secrecy Statute is thus unconstitutional in all its applications. It is facially invalid.

### Second Cause of Action
### 42 U.S.C. § 1983

**Section 24-3-580's Universal Disclosure Ban violates the First Amendment as applied to ACLU-SC because it is an impermissible viewpoint-based restriction on speech.**

99.     The allegations in all previous paragraphs are incorporated here.

100.     But for the Secrecy Statute, ACLU-SC would disseminate information it possesses as part of its advocacy and education efforts. That is the very type of scrutiny that the Secrecy Statute intended to suppress.

101.     The Secrecy Statute constitutes viewpoint discrimination that is unconstitutional as applied to ACLU-SC.

### Third Cause of Action
### 42 U.S.C. § 1983

**Section 24-3-580's Universal Disclosure Ban facially violates the First Amendment as an impermissible content-based restriction on speech.**

102.     The allegations in all previous paragraphs are incorporated here.

103.     Under the Secrecy Statute, to determine whether speech is unlawful, one must consider its content, namely: whether the speech contains "identifying information" about any entity that "prescribes, compounds, tests, uses, manufactures, imports, transports, distributes, supplies, prepares, or administers the drugs, medical supplies, or medical equipment utilized in the execution of a death sentence." S.C. Code Ann. § 24-3-580(A), (C).

104.     Thus, it is a content-based restriction on the right to disseminate and receive information and is subject to strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155, 163–65 (2015).

18

105.   The state does not have a compelling interest sufficient to justify the Secrecy Statute's draconian restrictions on speech.

106.   Even if the state had a compelling interest, the Secrecy Statute is not narrowly tailored to serve that interest. There are less restrictive means available, and the statute is overinclusive.

107.   The Secrecy Statute has no constitutional application. And, even if it did, those applications would be vastly outnumbered by its unconstitutional applications. Accordingly, the Secrecy Statute is overbroad and is facially invalid.

### Fourth Cause of Action
### 42 U.S.C. § 1983

**Section 24-3-580's Universal Disclosure Ban violates the First Amendment as applied to ACLU-SC because it is an impermissible content-based restriction on speech.**

108.   The allegations in all previous paragraphs are incorporated here.

109.   The state does not have a compelling interest sufficient to justify the Secrecy Statute's draconian restrictions on speech in this case.

110.   Even if the state had a compelling interest, the Secrecy Statute is not narrowly tailored to serve that interest in this case. There are less restrictive means available, and the statute is overinclusive as applied to ACLU-SC in this case.

111.   The Secrecy Statute is unconstitutional as applied to ACLU-SC in this case.

### Fifth Cause of Action
### 42 U.S.C. § 1983

**Section 24-3-580's State Disclosure Ban facially violates the First Amendment as an impermissible viewpoint-based restriction on disclosure of information.**

112.   The allegations in all previous paragraphs are incorporated here.

113.   Under the First Amendment, states may not "contract the spectrum of available knowledge" in order to suppress particular viewpoints, either by prohibiting private discussions or by restricting the disclosure of government-held information. *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 866 (1982) (plurality) (quoting *Griswold v.*

*Connecticut*, 381 U.S. 479, 482 (1965)); *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 569 (2011)

("[R]estrictions on the disclosure of government-held information can facilitate or burden the

expression of potential recipients and so transgress the First Amendment.").

114.    The Secrecy Statute restricts previously available information, *see supra* ¶¶ 29–

41, 72–77, 93, for the purpose of silencing disfavored speech.

115.    That is per se impermissible. *See Pico*, 457 U.S. at 871.

116.    Additionally, that restriction fails strict scrutiny.

117.    The state does not have a compelling interest sufficient to justify that restriction.

118.    Even if the state had a compelling interest, the restriction on previously available

information is not narrowly tailored to advance that interest.

119.    The Secrecy Statute's viewpoint-based restriction on previously available

information has no constitutional application. And, even if it did, those applications would be

vastly outnumbered by its unconstitutional applications. Accordingly, the restriction on

previously available information is overbroad and is facially invalid.

### *Sixth Cause of Action*
### <u>42 U.S.C. § 1983</u>
**Section 24-3-580's State Disclosure Ban facially violates the First Amendment by impermissibly restricting the public's right of access to information.**

120.    The allegations in all previous paragraphs are incorporated here.

121.    "The First Amendment . . . freedoms share a common core purpose of assuring

freedom of communication on matters relating to the functioning of government." *Richmond*

*Newspapers, Inc. v. Virginia*, 448 U.S. 555, 575 (1990).

122.    That includes the United States' "criminal law tradition," which "insists on public

indictment, public trial, and public imposition of sentence." *Smith v. Doe*, 538 U.S. 84, 99

(2003).

123.    Accordingly, the First Amendment provides a right of access to official

proceedings or documents (1) that "have historically been open to the press and general public;"

and (2) where 'public access plays a significant positive role in the functioning of the particular process in question.'" *Courthouse News Service v. Schaefer*, 2 F.4th 318, 326 (4th Cir. 2021) (quoting *Press-Enterprise Co. II*, 478 U.S. 1, 8–10 (1986)). "If both experience and logic indicate that a judicial record has in the past, and should in the future, be afforded public access, a qualified First Amendment right of public access attaches to it." *Id*.

124.    When a right of access exists, "the proceedings cannot be closed unless specific" facts "demonstrate[e] that 'closure is essential to preserve higher values and is narrowly tailored to serve that interest.'" *Press-Enterprise II*, 478 U.S. 1, 13–14 (1986) (quoting *Press-Enterprise I,* 464 U.S. 505, 510 (1984)).

125.    Historically, in South Carolina and elsewhere in the country, proceedings and documents revealing information about the qualifications of executioners and the materials used in executions have been a matter open to the public. *See supra* ¶¶ 29–41.

126.    "[P]ublic access" to information about the qualifications of executioners and the materials used in executions "plays a significant positive role"—in fact, a constitutional role—"in the functioning of" capital punishment. *See Press-Enterprise Co. II*, 478 U.S. 1, 8–10 (1986).

127.    The public's role is particularly important in this context because what the Eighth Amendment allows "is determined not by the standards that prevailed when the Eighth Amendment was adopted in 1791 but by the norms that 'currently prevail[]'"—in other words, "the evolving standards of decency that mark the progress of a maturing society." *Kennedy v. Louisiana*, 554 U.S. 407, 419 (2008) (quotation marks and citations omitted).

128.    The state has echoed the importance of the public's role in determining constitutional evolving standards of decency: "If there is anything evolving, it's the *people*'s consideration of these punishments and their decisions of what to enact through their elected representatives. . . . It's the debate *the people* want to have."[17]

---

[17] Oral argument at 25:03, 25:37, *Owens v. Stirling*, No. 2022-1280 (S.C. Sup. Ct. Feb. 6, 2024) (emphases added), https://media.sccourts.org/videos/2022-001280-2.mp4.

129.    By hiding critical information about the qualifications of executioners and the materials used in executions from the public, the Secrecy Statute prevents the public from understanding how the death penalty is carried out and therefore from fulfilling its role in determining the "evolving standards of decency."

130.    Shutting down the right of access to execution-related information does not serve higher values.

131.    Nor is it narrowly tailored to serve the state's interest.

## **RELIEF REQUESTED**

a.    Preliminarily and permanently enjoin Defendant Wilson, and his agents and employees, from enforcing South Carolina Code Section 24-3-580's Universal Disclosure Ban;

b.    Declare that South Carolina Code Section 24-3-580's Universal Disclosure Ban is invalid on its face and as applied to ACLU-SC;

c.    Permanently enjoin Defendant Stirling, and his agents and employees, from enforcing South Carolina Code Section 24-3-580's State Disclosure Ban;

d.    Declare that South Carolina Code Section 24-3-580's State Disclosure Ban is invalid on its face;

e.    Enter judgment for Plaintiff ACLU-SC against Defendants;

f.    Award such costs and reasonable attorneys' fees to which ACLU-SC might be entitled by law, including 42 U.S.C. § 1988; and

g.    Award such other relief as the Court may deem just and appropriate.

Dated: January 29, 2025

Respectfully submitted,


 */s/ Meredith McPhail*

Meredith D. McPhail
Allen Chaney
ACLU OF SOUTH CAROLINA
P.O. Box 1668
Columbia, SC 29202
(843) 259-2925
mmcphail@aclusc.org

*/s/ Jonathan Spratley*

Steven M. Cady (*pro hac vice forthcoming*)
Jonathan E. Spratley (*pro hac vice forthcoming*)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
(202) 434-5256
jspratley@wc.com

*Attorneys for Plaintiff*